# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 21-2220V
### Filed: December 5, 2025

|  |  |
|---|---|
| RONALD MARTIN,<br><br>                      Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                  Respondent. | Special Master Horner |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*
*Meghan Murphy, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

       On November 29, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012).[2]  In the initial petition, he alleged a Table Injury of "SIRVA," *i.e.* a shoulder injury related to vaccine administration, as well as polymyalgia rheumatica ("PMR"), resulting from an influenza ("flu") vaccination he received on October 1, 2019.  (ECF No. 1.)  However, he later filed an amended petition narrowing his claim to the alleged shoulder injury and specifying that he was pursuing that shoulder injury claim on a "causation in fact" basis or, alternatively, as a significant aggravation claim.  (ECF No. 19.)

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

For the reasons set forth below, I conclude that petitioner is entitled to compensation for a shoulder injury caused in fact by his vaccination.

## I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a causal link between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within 48 hours of vaccine administration.  § 300aa-14(a), *amended by*, 42 C.F.R. § 100.3.  Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provide a more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.  42 C.F.R. § 100.3(c).  To be considered a "Table SIRVA," petitioner must show that his injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i)     No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii)    Pain occurs within the specified time-frame;

(iii)   Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv)    No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

## II.    Procedural History

Petitioner initially filed medical records and an affidavit marked as Exhibits 1-14. (ECF No. 6.)  After a status conference, and after I noted the outcome of prior cases alleging PMR, petitioner filed his amended petitioner narrowing his claim to his alleged shoulder injury.  (ECF Nos. 15, 19.)  However, I additionally noted that there was a potentially significant issue as to onset of petitioner's alleged shoulder pain.  (ECF No. 15, p. 1.)

Respondent filed his Rule 4 Report in October of 2022.  (ECF No. 20.) Respondent argued that petitioner's medical records were inadequate to identify a specific injury that could support a causation-in-fact analysis.  (*Id.* at 10 (citing *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010)).)  Assuming such analysis was appropriate, respondent further contended that the medical records lacked a theory and medical opinion necessary to support a cause in fact claim and that an appropriate temporal relationship was not established.  (*Id.* at 11.)  To the extent petitioner alternatively pleaded significant aggravation, respondent contended that petitioner did not have any relevant pre-existing condition.  (*Id.* at 12-13.)

Following the filing of respondent's report, petitioner filed additional medical records (Exhibit 17), several witness affidavits (Exhibits 18-20), and an expert report by orthopedic surgeon Uma Srikumaran, M.D. (Exhibits 21-40).  (ECF No. 24.) Respondent filed a responsive report by orthopedic surgeon Geoffrey Abrams, M.D. (Exs. A-B; ECF No. 28.)  Thereafter, I issued a Rule 5 Order confirming that the factual question of onset of petitioner's shoulder pain would be a central issue and advising that a fact hearing would be necessary.  (ECF No. 29.)

A video fact hearing was held on April 24, 2024.  (*See* Transcript of Proceedings ("Tr."), at ECF No. 37.)  Petitioner was the only witness.  During the hearing, it was revealed that petitioner had submitted a VAERS[3] report.  Petitioner also referenced leave requests he submitted to his employer.  Petitioner filed these materials (marked as Exhibits 42-44) in May of 2024.  (ECF No. 38.)

Thereafter, the parties proposed resolving entitlement based on written briefs. (ECF No. 39.)  Thus, petitioner filed a motion for a ruling on the written record on August 20, 2024.  (ECF No. 40.)  That motion was fully briefed.  (ECF Nos. 41-42.)

---

[3] The Vaccine Adverse Reporting System ("VAERS") is a national early warning system that is co-managed by the Centers for Disease Control and Prevention (CDC) and the U.S. Food and Drug Administration (FDA) and was established to detect possible safety problems in U.S.-licensed vaccines. *About VAERS: Background and Public Health Important*, VAERS, https://vaers.hhs.gov/about.html (last visited Nov. 20, 2025).  VAERS is a passive reporting system, meaning that it relies on individuals to submit reports of adverse events following vaccination.  *Id.*  Anyone can submit a VAERS report.  *Id.*  As a result, "VAERS is not designed to determine if a vaccine caused a health problem," but it can be "useful for detecting unusual or unexpected patterns of adverse event reporting that might indicate a possible safety problem with a vaccine."  *Id.*

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

### III.    Summary of Record Evidence

a.  Medical Records

Petitioner received the vaccination at issue in his right shoulder on October 1, 2019. (Ex. 1, p. 1.) He had a prior history of osteoarthritis, neuropathy, bilateral thumb joint pain, and a right shoulder dislocation in 1983. (Ex. 8, p. 102; Ex. 2, pp. 165, 177.) About two weeks post-vaccination, on October 14, 2019, petitioner e-mailed his primary care provider as follows:

> I got my flu shot at work on 10/1 and I thought it was given a bit high on my arm. Now for the last week, I have had deep achy pain with tingling fingers and stiffness in the shoulder itself. It wakes me up at night and during the day it feel like it did when I dislocated it many years ago. What do I need to do? This is all in my right shoulder.

(Ex. 2, p. 172.) A follow up x-ray was performed the next day, on October 15, 2019. It was negative, except for mild acromioclavicular arthrosis. (*Id.* at 64.)

Petitioner then presented to the emergency department for care on October 27, 2019. (Ex. 2, p. 165.) The history was as follows:

> 55-year-old white male ER nurse dislocated his right shoulder as a teenager and underwent repair at that time. As he has gotten older, he has developed some osteoarthritis for which he takes meloxicam. On 10/1 he got a flu shot in his right shoulder. 2 days later began to notice right shoulder pain. This became progressively worse over 2 weeks. He took a course of prednisone which improved symptoms remarkably but these all returned as soon as he completed with the current course of therapy. He now has progressive right shoulder pain especially with abduction and active or passive external rotation of the humerus. He also has some mild right neck paraspinous pain that has full range of motion. He does note some paresthesias down his right arm with certain motions of his shoulder, but not neck. No chills, fevers, or other symptoms. He has noticed some increase in his bilateral hip pain which improves with activity temporarily. chills, fevers, or sweats.

(*Id.*)

On physical exam, petitioner had full range of motion in his neck, though he had mild tenderness on the right. (Ex. 2, p. 167.) His right shoulder was only mildly tender to deep palpation, but he had "particularly painful" active and passive abduction and external rotation. (*Id.*) The emergency department physician suspected a post traumatic arthritis affecting petitioner's prior shoulder dislocation; however, it was noted that he was already on a maximum dose of meloxicam. (*Id.*) Accordingly, petitioner was referred for an orthopedic surgical consult. (*Id.*)

He returned to the emergency department two days later, on October 30, 2019. (Ex. 2, pp. 153-54.) At that time, he complained of one month of bilateral shoulder pain, though mostly on the right side, along with hip and neck pain and ten days of night sweats without fever. (*Id.* at 154.) On physical exam, petitioner had limited range of motion in the right shoulder and his neck range of motion was limited by pain, but he had normal range of motion in the hips. (*Id.* at 157.) Lab results were normal except for slightly elevated erythrocyte sedimentation rate ("ESR"). (*Id.* at 81-84, 157-60.) The attending physician suspected a possible reactive arthritis following vaccination. (*Id.* at 160.)

A follow up MRI of the neck performed the next day showed multi-level cervical spondylosis. (Ex. 2, pp. 58-59.) An MRI of the right shoulder showed:

- Moderate/large glenohumeral joint effusion with synovitis particularly anteriorly and within the rotator interval;
- Tendinosis of the supraspinatus and infraspinatus distal tendon fibers with a full/near full-thickness tear of the anterior supraspinatus tendon fibers;
- High-grade tendinosis with low-grade partial-thickness undersurface tears of the distal tendon fibers predominantly involving the central components of the distal subscapularis tendon;
- Marked irregularity of the glenoid labrum both anteriorly and posteriorly, but worst anteriorly consistent with tear. There is no bone marrow edema to suggest an acute or subacute dislocation event although remote injury cannot be excluded by imaging;
- Tearing of the inferior glenohumeral ligament predominantly involving the posterior band from its humeral attachment (HAGL).

(*Id.* at 60-63.) An MRI of the left shoulder on November 3, 2019, found moderate acromial clavicular arthropathy with a small amount of joint fluid and abnormal signal at the superior labrum, which might represent a tear. (*Id.* at 55-58.)

Petitioner then presented to an orthopedist on November 6, 2019. (Ex. 5, p. 10.) His new patient intake form indicated that he was presenting for "30+ days of pain from flu shot," specifying his pain was in his bilateral shoulders and hips. (*Id.*) He listed the date of injury as October 1, 2019. (*Id.*) During the encounter, he reported that "his pain began to set in a couple days after his immunization and gradually progressed." (*Id.* at 15.) Based on the physical exam and review of the prior MRI, the orthopedist felt

petitioner had near to full thickness tears of the supraspinatus tendons, a subchondral cystic formation at the humeral head, and adhesive capsulitis. (*Id.* at 16.) The orthopedist agreed that the adhesive capsulitis may have been related to the immunization, either as a direct reaction or as an exacerbation of underlying rotator cuff pathology. (*Id.*) Petitioner was referred to physical therapy, which he pursued from November 20, 2019 through January 24, 2020. (*Id.* at 16, 19-20; Ex. 3.) Petitioner's complaints of neck and hip pain were not assessed.

Petitioner subsequently presented to an immunologist on November 13, 2019, to investigate whether he had experienced an allergic reaction to his vaccination and reported post-vaccination symptoms affecting his right arm and both hips. (Ex. 7, pp. 10-12.) The immunologist diagnosed a probable non-IgE mediated reaction to the flu vaccine. (*Id.* at 12.) However, petitioner was also referred to a neurologist for further evaluation. (*Id.*) When petitioner presented to a neurologist on December 4, 2019, he reported numbness and tingling bilaterally down his upper extremities and pain in his bilateral lower extremities. (Ex. 4, p. 6.) On exam, he had patchy decreased sensation to pinprick in the upper extremities and was hyperreflexic at the knees. (*Id.*) He was assessed with lumbar radiculopathy, and an EMG and MRI were ordered. (*Id.* at 6-7.) An MRI of the bilateral hips showed bilateral anterosuperior chondrolabral separations, which orthopedics felt were likely early findings of osteoarthritis. (Ex. 2, pp. 55, 106.) On December 16, 2019, petitioner presented to a rheumatologist, who diagnosed petitioner with PMR. (Ex. 6, pp. 18-21.)

Thereafter, petitioner continued treatment for his diagnosed PMR. However, on October 21, 2020, he returned to his orthopedist complaining that he was still experiencing constant right shoulder pain despite the treatment for his PMR. (Ex. 11, pp. 26, 28.) The orthopedist felt that petitioner's adhesive capsulitis had resolved with physical therapy, but recommended surgery to repair the rotator cuff. (*Id.* at 30.) Petitioner agreed (*Id.*); however, after a pre-operative MRI, the radiologist felt petitioner did not have a full-thickness rotator cuff tear, but instead moderate to severe acromioclavicular ("AC") joint osteoarthritis with trace fluid in the subacromial-subdeltoid bursa. (Ex. 12, p. 20.) The orthopedist disagreed and the surgery was performed on January 14, 2021. (Ex. 11, p. 22; Ex. 9, p. 3.) Arthroscopic findings included an intact rotator cuff, dense subacromial bursitis, an anterior hook on the acromion, degenerative tearing of the labrum, and grade 3 to grade 4 chondromalacia of the glenoid and of the humeral head with extensive cartilage loss of the posterior humeral head. (Ex. 9, p. 3.)

The remainder of the medical records are not informative of the issues to be resolved.

  b. Testimony

  i. *Petitioner*

Petitioner filed an affidavit, dated December 8, 2021, and also testified during the fact hearing, held on April 24, 2024.  Petitioner's affidavit focused more on his alleged damages than on the initial onset of his symptoms.  (Ex. 14.)

Although petitioner suffered a prior shoulder injury as a teenager (Tr. 8), he testified that he was not experiencing any shoulder problems at the time of the vaccination at issue (*Id.* at 9-10.)  At the time of injection, however, petitioner felt "immediate pain, [that] actually made my arm and fingers tingle and kind of hurt, which just wasn't normal."  (*Id.* at 11.)  After that, petitioner, an emergency department medic at the time, returned to work, where he found he was having difficulty reaching for the phone at the charge nurse desk, which he discussed with the charge nurse.  (*Id.* at 6, 12.)  His arm continued to hurt at the end of his shift.  (*Id.* at 13.)  Petitioner also recalled telling his wife about his arm pain when he got home from work.  (*Id.* at 13-14.)  Unlike normal post-vaccination soreness, petitioner's pain did not improve, but instead got worse.  (*Id.* at 13.)  The achiness got "fairly aggressive" overnight and then continued to worsen on the second day.  (*Id.* at 15.)  On the day of the vaccination, the pain had been a "nagging, burning-type" of sensation.  On the second day, however, it became a "deep visceral ache."  (*Id.* at 16.)

Petitioner subsequently complained to Mr. Reid about his pain, which is separately reflected in the affidavit discussed below.  (Tr. 16.)  He testified that Mr. Reid let petitioner leave early.  (*Id.* at 16-17.)  However, the timing of this occurrence is unclear.  Petitioner testified that this interaction was "several days" into the course of his condition (*Id.* at 16) and, as explained below, Mr. Reid placed this interaction in "early October" (Ex. 20).  However, petitioner confirmed in testimony that his early departure was marked as a use of sick leave.  (Tr. 16-17.)  Petitioner's subsequently filed leave records indicate that in October of 2019, petitioner did not take sick leave until October 17 and at that time took a full 12-hour shift of leave.  (Ex. 44, p. 1.)  Petitioner did not take a partial 8-hours of leave until November of 2019.  (*Id.*)

Regarding the e-mail he sent to his primary care provider on October 14, 2019, which had stated his shoulder had been hurting "for the last week," petitioner testified that this timeframe was stated "just in general" and was only an approximation.  (Tr. 21-22.)  He suggested that the subject line of the e-mail ("shoulder issue 14 days after getting flu shot") is more representative of the fact that he had been experiencing pain for about 14 days, ever since the time of the vaccination.  (*Id.* at 19-21.)  The pain was getting worse throughout this period.  (*Id.* at 22.)  Petitioner testified that, around the same time he sent this e-mail, petitioner began conducting his own research online.  (*Id.* at 36-37.)  It was at this time that petitioner completed and submitted a VAERS report.  (*Id.* at 37.)  Petitioner's VAERS report was subsequently filed into the record.  (Exs. 42-43.)  In the VAERS report, which was submitted October 15, 2019, petitioner described his condition as "[e]xtreme weakness and deep aching to sharp pain.  Severe sharp

pain when moving in some directions. Numbness to outer upper shoulder with intermittent finger tingling. (Ex. 43, p. 2.) Contrary to petitioner's e-mail the day prior, the VAERs report records the date of onset as October 4, 2019, three days post vaccination. (*Id.*) In his testimony, petitioner distinguished his e-mail to his primary care provider from his VAERS report, explaining that when e-mailing his physician, he was unaware of the SIRVA concept and was focused on pain relief. (Tr. 38.)

### ii. Darlene M. Rousselle

Petitioner also filed an affidavit by his wife, Ms. Rousselle. (Ex. 18.) In pertinent part, Ms. Rousselle averred regarding the day of petitioner's vaccination that, "[w]hen he came home that evening, he made mention that 'wow this shot was the first one that has ever really hurt. I think they may have given it too high on my arm." (*Id.* at 1.) Thereafter, she recalled that, "[o]ver the next couple days, he complained of the pain being worse than with a normal shot." (*Id.*) "By night 3, the pain was causing him to wake up with severe pain in the right shoulder." (*Id.*) "By day 4, I would say, he could not lift his right arm past more than a quarter of the way up and he said using it to drive was virtually impossible." (*Id.*)

### iii. Kayleen Martin

An additional affidavit by petitioner's mother, Ms. Martin, was filed. (Ex. 19.) Ms. Martin recalled that

> It was the second day after he had his shot that he and his wife came to the house to visit, and he kept rubbing his right shoulder. I asked him what was wrong. He said that his flu shot from the day before was just really hurting extremely bad. I could tell the pain was pretty significant because he was just not acting himself. He said he felt that the nurse giving the shot may have given it too high.

(*Id.* at 1.)

Additionally:

> By the next day, my son's wife contacted me and said that Ronnie's shoulder was really bad, and it was keeping him up and he was unable to lift it over his head. That evening I went to their house to check on him and he had less movement than he had the day prior. I asked him if it was just the regular pain from getting a shot and he assured me that this pain was way more than normal pain.

(*Id.*) Ms. Martin recalled that petitioner "missed days of work because of it for another week or so." (*Id.* at 1-2.)

### iv. Erik Reed, R.N.

Finally, Mr. Reed, petitioner's charge nurse at his place of employment at the time of his alleged injury, provided an affidavit recalling:

> I remember one instance when Mr. Martin was working next to me at the charge desk, and he was having issues lifting his right arm to answer the phones. I believe this was early October of 2019. He told me he had recently received his flu vaccine and that his arm was really hurting. I witnessed Mr. Martin trying to push through this situation and I could see the painful look on his face when typing on the computer and when trying to reach for the phones. I asked him how he felt, and he stated that his arm had this horrible deep pain and stiffness. He had stated that it was to the point of it causing him nausea.

(Ex. 20.) Mr. Reed indicated that he released petitioner from duty that day. (*Id.*)

### c. Expert Opinions

Petitioner filed an expert report by orthopedic surgeon Uma Srikumaran, M.D.[4] (Ex. 21.) Dr. Srikumaran opined that several publications support the idea that vaccinations can cause shoulder injuries when vaccine antigen is inadvertently injected into the subacromial bursa, leading to a robust local immune inflammatory response that can lead to bursitis or capsulitis and/or activate pathology affecting the biceps tendon, glenohumeral joint. (*Id.* at 26-27 (citing Marko Bodor & Enoch Montalvo, *Vaccination-Related Shoulder Dysfunction*, 25 VACCINE 585 (2007) (Ex. 26), S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 VACCINE 8049 (2010) (Ex. 23); L.H. Martín Arias et al., *Risk of Bursitis and Other Injuries and Dysfunctions of the Shoulder Following Vaccination*, 35 VACCINE 4870 (2017) (Ex. 24)).) Dr. Srikumaran noted that this process most often occurs within 48 hours of vaccination. (*Id.* at 27 (citing Arias et al., *supra*, at Ex. 24)); however, he also cited literature finding a three-day period of increased risk of bursitis occurring post-vaccination. (*Id.* at 31-32

---

[4] Dr. Srikumaran received his medial degree from Johns Hopkins University School of Medicine in 2005, before going on to complete an internship in general surgery and orthopedic surgery, as well as a residency in orthopedic surgery, at Johns Hopkins Hospital in 2006 and 2010, respectively. (Ex. 22, p. 1.) From there, Dr. Srikumaran completed a fellowship in shoulder surgery at Harvard in 2011. (*Id.*; Ex. 21, p. 1.) He is board certified in orthopedic surgery, and he maintains an active medical license in Maryland. (Ex. 22, p. 10.) Dr. Srikumaran currently works as the Director of the shoulder fellowship in the Department of Orthopaedic Surgery and the Assistant Director of the Orthopaedic Surgery, Shoulder Division, at Johns Hopkins University School of Medicine; the Medical Director at Howard County Johns Hopkins Orthopaedic Surgery; and the Chair of the Department of Orthopaedic Surgery at Howard County General Hospital. (*Id.* at 2.) In his clinical capacity, Dr. Srikumaran has treated approximately 10-12 patients with shoulder dysfunction following vaccination in the last five years. (Ex. 21, p. 1.) Additionally, Dr. Srikumaran maintains a position as an associate professor of orthopedic surgery at Johns Hopkins University School of Medicine. (Ex. 22, p. 2.) Dr. Srikumaran has authored several publications in the field of shoulder surgery, including two articles specifically discussing SIRVA. (*Id.* at 2-6; Ex. 21, p. 1.)

(citing Elisabeth M. Hesse et al., *Risk for Subdeltoid Bursitis After Influenza Vaccination: A Population-Based Cohort Study*, 173 ANNALS INTERNAL MED. 253 (2020) (Ex. 32)).)  In petitioner's case, Dr. Srikumaran credits petitioner's October 27, 2019 emergency department record, which explicitly placed onset of petitioner's shoulder pain at two days post-vaccination.  (*Id.* at 21 (citing Ex. 2, p. 165).)  Dr. Srikumaran endorses the treating orthopedist's diagnosis of adhesive capsulitis, which he notes to be a common sequela of SIRVA, stressing that petitioner's positive impingement signs and reduced range of motion are well documented.  (*Id.* at 22.)  And, although petitioner had evidence of fraying or torn ligaments, these were asymptomatic prior to vaccination.  Thus, pursuant to his theory, the vaccine "triggered" them by initiating inflammation.  (*Id.*)  Dr. Srikumaran therefore opines that a logical sequence of cause and effect implicates petitioner's vaccination as a cause of his condition.  (*Id.* at 27.)  The presence of neck pain is not confounding, because shoulder pathology can result in pain referred from the shoulder to the neck.  (*Id.* at 23-24.)  Dr. Srikumaran does not necessarily accept petitioner's PMR diagnosis as accurate but, in any event, does not believe the right shoulder injury can be attributed to PMR, given that it had a distinct onset prior to onset of the other symptoms later diagnosed as PMR.  (*Id.* at 25-26.)

Respondent filed a responsive expert report by orthopedic surgeon Geoffrey Abrams, M.D.[5]  (Ex. A.)  Dr. Abrams stresses that, although "Dr. Srikumaran provides a well written and referenced description of the clinical symptoms as well as mechanism of SIRVA[,] . . . [i]n none of these referenced articles is SIRVA described as a condition outside the shoulder."  (*Id.* at 8.)  Dr. Abrams opines that any assessment of SIRVA is confounded by petitioner's broader presentation of musculoskeletal complaints, including both cervical spine pathology and PMR.  (*Id.* at 8-10.)  Dr. Abrams notes that petitioner repeatedly referenced experiencing bilateral shoulder pain, as well as neck pain significant enough to warrant a spinal MRI.  (*Id.* at 10-11.)  Moreover, Dr. Abrams opines that the onset of petitioner's condition more likely occurred about one-week post-vaccination, which does not support a SIRVA.  (*Id.* at 11-12.)  Dr. Abrams acknowledges that petitioner did have significant right shoulder pathology demonstrated on MRI, but opines that his ultimate surgical findings, including chondromalacia of the glenoid and humerus with extensive cartilage loss of the posterior humeral head and degenerative labrum, are not associated with SIRVA.  Instead, subacromial bursitis as would be expected in SIRVA would occur above the rotator cuff and away from the ball and socket.  (*Id.* at 12.)

---

[5] Dr. Abrams received his medical degree from the University of California, San Diego, in 2007, before going on to complete a surgical internship in the Department of General Surgery and a residency in the Department of Orthopedic Surgery from Stanford University Hospital and Clinics in 2008 and 2012, respectively.  (Ex. B, pp. 1-2.)  From there, Dr. Abrams completed a fellowship in orthopedic sports medicine at Rush University Medical Center in 2013.  (*Id.* at 1.)  He is board certified in orthopedic surgery with a subspecialty in orthopedic sports medicine, and he maintains an active medical license in California.  (*Id.* at 2.)  He currently works as the Director of Sports Medicine for Varsity Athletics Lacob Family Sports Medicine Center at Stanford University and as an associate professor at Stanford University School of Medicine.  (*Id.* at 1.)  He has authored several peer-reviewed publications on shoulder and other musculoskeletal pathology.  (Ex. A, p. 1; Ex. B, pp. 2-31.)

## IV.    Discussion

### a. <u>Fact finding as to the onset of shoulder pain</u>

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 300aa-11(c)(2). The special master is required to consider "all . . . relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 300aa-13(b)(1)(A).  However, the special master is then required to weigh all of the evidence presented.  *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (concluding that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence).  The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record.  *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 300aa-12(d)(3); Vaccine Rule 8), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 417.  Thus, for example, the Vaccine Act explicitly instructs that a special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period."  § 300aa-13(b)(2).  However, such a finding must in all events be supported by preponderant evidence.  *Id.*

The Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule is not absolute.  There is no presumption that medical records are accurate or complete as to all of a patient's physical conditions.  *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).  Afterall, "medical records are only as accurate as the person providing the information."  *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).  "[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."  *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting the decision below), *aff'd per curiam*, 968 F.2d 1126 (Fed. Cir. 1992).  When witness testimony is offered to overcome the weight generally afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling."

*Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). Further, a special master must consider the credibility of the individual offering the testimony. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Petitioner argues that "his sworn testimony at the April 24, 2024, fact-finding hearing, combined with medical records, as well as the supporting affidavits of eyewitnesses, establish by a preponderance of evidence that the onset of petitioner's symptoms occurred within 48 hours of his October 1, 2019, flu vaccination." (ECF No. 40, n. 4.) Petitioner argues that his October 14, 2019 e-mail to his physician (which stated symptoms had occurred "for the last week") should not be interpreted as specifying that onset occurred specifically one-week prior. (*Id.* at pp. 14-15.) Moreover, he notes that, at around the same time he sent this e-mail, he submitted a VAERS report which placed onset at 3 days post-vaccination. (*Id.* at n. 6.) Furthermore, petitioner's initial in-person encounter record specifies that onset occurred 2 days post-vaccination. (*Id.* at 12.) Respondent argues, however, that the evidence does not preponderate in favor of a finding that onset occurred within 48 hours of vaccination. (ECF No. 41, pp. 11-13.) Respondent stresses that the October 14, 2019 e-mail is the earliest record of petitioner's shoulder pain and is "in his own words." (*Id.* at 11-12.) Respondent further suggests that petitioner's testimony lacks reliability, because he testified that nurse Reed sent him home "several days" after his shoulder pain started, but this is not supported by his leave records. (*Id.* at 12.) Even accounting for the additional witness affidavits, respondent argues that petitioner's contemporaneous account should not be set aside in favor of later produced testimonial evidence. (*Id.* at 12-13.)

Several of petitioner's arguments as to onset are unpersuasive. In particular, I am not persuaded by petitioner's argument that his e-mail statement that his symptoms had been present "for the last week" can be interpreted as anything other than an explicit statement indicative of the onset of the shoulder pain. Moreover, I agree with respondent that it is significant that this e-mail was in petitioner's "own words" and is the most contemporaneous record of petitioner's recollection. *Demitor v. Sec'y of Health & Human Servs.*, No. 17-564V, 2019 WL 5688822, at *10 (Fed. Cl. Spec. Mstr. Oct. 9, 2019) (finding significance in the fact that a history derived from petitioner's own handwritten intake form, meaning "it cannot be said to reflect any transcription mistake or miscommunication on the part of the [provider] or his office. Nor can petitioner reasonably suggest that she was incompletely or incorrectly paraphrased.").

I also do not agree with petitioner's suggestion that the testimonial evidence is credible enough to overcome the more contemporaneous records. As respondent points out, it is concerning that a primary point of reference for petitioner's recollection – his early dismissal by nurse Reed – is not supported by his leave records. Petitioner criticizes respondent for attempting "to discredit petitioner's recollections by faulting him for not being able at the fact-finding hearing to pinpoint the date on which petitioner first

took a sick day from work due to his worsening right shoulder pain." (ECF No. 42, p. 2.) However, while I am sympathetic that it is difficult to remember events that happened years earlier, this only underscores why later testimony often fails to persuasively contradict contemporaneous records. Among all of the affidavits and testimony, the early dismissal was one of very few, if not the only, concrete event available to anchor the fact witnesses accounts to a specific timeframe, and it is not ultimately corroborated.

Because I am not persuaded by petitioner's arguments, and because I do not find the testimonial evidence outweighs the more contemporaneous records, the only remaining question is what conclusion can be reached from the various reports included within the contemporaneous records. In this case, the records reflect the following:

- The earliest record was created two weeks post-vaccination, on October 14, 2019, and in it, petitioner states that, "I got my flu shot at work on 10/1 and I thought it was given a bit high on my arm. Now for the last week, I have had deep achy pain." (Ex. 2, p. 172.)
- The next day, petitioner submitted a VAERS report. Petitioner identified the date of onset of his shoulder symptoms as October 4, 2019, which is three days post-vaccination. (Ex. 43, p. 2)
- On October 27, 2019, petitioner's first in-person encounter for treatment at the emergency department recorded the following history: "On 10/1 he got a flu shot in his right shoulder. 2 days later began to notice right shoulder pain." (Ex. 2, p. 165.)
- Two days later, on October 30, 2019, petitioner returned to the emergency department and complained of one month of shoulder pain, which effectively places onset at (or even right before) vaccination. (Ex. 2, pp. 153-54).

Generally, more contemporaneous histories are given greater weight. *See e.g.*, *R.K. v. Sec'y of Health & Human Servs.*, No. 03-632V, 2015 WL 10936124, at *76 (Fed. Cl. Spec. Mstr. Sep. 28, 2015) (holding that more remote histories of illness do not have sufficient indicia of reliability to be credited over conflicting contemporaneous medical records and earlier reported histories), *mot. for rev. denied*, 125 Fed. Cl. 57 (2016), *aff'd*, 671 F. App'x 792 (Fed. Cir. 2016); *see also, e.g.*, *Vergara v. Sec'y of Health & Human Servs.*, No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those *recounted in later medical histories*, affidavits, or trial testimony." (emphasis added)). However, special masters are required to consider the record as a whole and no single record should be given outsized importance as among medical histories taken a short time apart. *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 538-59 (2011).

Here, contrary to petitioner's later testimony, none of these records explicitly place onset of petitioner's shoulder pain on the date of vaccination while some explicitly contradict the notion that onset occurred within 48 hours of vaccination. Considered as

a whole, these records do not demonstrate that onset of shoulder pain occurred within 48 hours of vaccination and further demonstrate a clear pattern whereby as time went by, petitioner more closely associated his shoulder pain with his vaccination.  However, although my prior Rule 5 order cautioned that petitioner's October 14, 2019 e-mail stands as the most contemporaneous recollection available (ECF No. 29), petitioner's subsequent filing of his October 15, 2019 VAERS submission greatly complicates how much weight can be placed on that e-mail as singularly reflecting petitioner's earliest accounting of his shoulder pain.  *Shapiro*, 101 Fed. Cl. at 538 (explaining that "[l]ogic and a few cases suggest that the special weight given an earlier record of an event over a later one diminishes when the first record is made some time after the event recorded; ought to diminish further when the time interval between two *post hoc* records is slight; and should all but disappear where the records are both *post hoc*, created within a short time of each other, and come with the same badges of reliability").

With the filing of the VAERS report, the two most contemporaneous pieces of evidence, both representing petitioner's "own words" and created just a day apart, place onset of right shoulder pain at no more than seven days post-vaccination and no fewer than three days post vaccination.  (*Compare* Ex. 2, p. 172, *with* Ex. 43, p. 2.)  And, although I am not persuaded by petitioner's attempt to effectively rewrite the e-mail with a years-later hindsight, I do give some credence to his testimony that the e-mail was focused on the worsening of his pain and prompted by his pain becoming unbearable (Tr. 28, 32), which could help explain why his e-mail incorrectly suggested a later initial onset.  Additionally, I note that the VAERS report is more consistent with the subsequent treatment records.  Thus, I find that the evidence preponderates in favor of a finding that the initial onset of petitioner's shoulder pain began about three days post-vaccination and worsened thereafter.

b.   Table injury

In his motion, petitioner asserts that he has satisfied the requirements of a Table Injury of SIRVA.  (ECF No. 40, pp. 8-9.)  However, this argument was premised on his assertion that he had preponderantly demonstrated that onset of his shoulder pain occurred within 48 hours of vaccination, as required by the Vaccine Injury Table.  Because I have found that onset of shoulder pain initially occurred three days post-vaccination, petitioner cannot demonstrate the presence of a Table SIRVA.

c.   Causation-in-fact

i.   Althen *prong one*

Under *Althen* prong one, petitioner must provide a "reputable medical theory," demonstrating that the vaccine received can cause the type of injury alleged.  *Pafford*, 451 F.3d at 1355-56 (citations omitted).  Such a theory must only be "legally probable, not medically or scientifically certain."  *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994).  Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific

mechanism, or a generally accepted medical theory. *Andreu*, 569 F.3d at 1378-79 (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)). However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [his] theory. While it does not require medical or scientific certainty, it must still be 'sound and reliable.'" *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (quoting *Knudsen*, 35 F.3d at 548-49).

Petitioner relies on Dr. Srikumaran's opinion, stressing that he explained, based on published medical literature that "injection of vaccine antigen into the subacromial bursa led to a 'robust local immune and inflammatory response' leading to pathology of the subacromial space, biceps tendon, glenohumeral joint, and capsulitis." (ECF No. 40, p. 11 (quoting Bodor & Montalvo, *supra*, at Ex. 26); *see also* Atanasoff et al., *supra*, at Ex. 23.) Respondent does not dispute that this constitutes a viable theory, noting that it is essentially the basis for the Table Injury of SIRVA (ECF No. 41, p. 17); however, he contests that this theory is appliable to petitioner's case, stressing both the need for petitioners to identify a defined and recognized injury (*Id.* at 14-15), as well as contending that petitioner's case fails under *Althen* prongs two and three (*Id.* at 18-21).

In light of the above, and considering the record as a whole, petitioner has met his preponderant burden of proof under *Althen* prong one.

### ii. Althen *prong three*

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1278. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* at 1281. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

Of course, the Table Injury of SIRVA requires that onset of shoulder pain occur within 48 hours of vaccination. 42 C.F.R. § 100.3(a). Given this, both parties benchmark their arguments under *Althen* prong three against a 48-hour onset period, focusing largely on the factual question of symptom onset and paying little attention to what constitutes a timeframe from which a causal inference can be drawn. (ECF Nos. 40-42.) However, *Althen* prong three does not simply apply the Table timeframe. Under *Althen* prong three, special masters look to the available evidence regarding the condition's etiology and are cautioned against setting hard and fast deadlines for onset. *Paluck v. Sec'y of Health & Human Servs.*, 786 F.3d 1373, 1383-84 (Fed. Cir. 2015). In that regard, prior program experience with respect to shoulder injuries caused-in-fact by vaccination shows that, while the medical literature generally favors a 48-hour onset in the majority of cases, this is not absolute. *Compare Pitts v. Sec'y of Health & Human Servs.*, No. 18-1512V, 2023 WL 2770943, at *14 (Fed. Cl. Spec. Mstr. Apr. 4, 2023) (finding one-week post-vaccination onset is not supported), *with Murray v. Sec'y of*

*Health & Human Servs.*, No. 17-1357V, 2022 WL 17829797, at \*16-17 (Fed. Cl. Spec. MStr. Oct. 27, 2022) (finding entitlement where onset of shoulder pain occurred within "a few days" and less than seven days post-vaccination), *and Jewell v. Sec'y of Health & Human Servs.*, No. 16-0670V, 2017 WL 7259139, at \* 3 (Fed. Cl. Spec. Mstr. Aug. 4, 2017) (finding entitlement for shoulder injury occurring 72 hours post-vaccination).

In this case, for the reasons discussed in Section IV(a), *supra*., I have concluded that the onset of shoulder pain arose approximately three days post-vaccination.  In that regard, while Dr. Srikumaran largely focused on a 48-hour period of onset, he also explained that a study by Hesse et al. found an increased risk of subdeltoid bursitis following influenza vaccination with a risk interval up to three days post-vaccination.  (Ex. 21, pp. 31-32 (discussing Hesse et al., *supra*, at Ex. 32).)  He further explained that "[t]he study by Hesse et al is quite informative as it relates to SIRVA as it is established that there is an elevated risk of bursitis after getting a vaccination, more than can be attributed to the common degenerative conditions of the shoulder (impingement, arthritis, etc.)."  (*Id.* at 31.)  Dr. Abrams did not discuss the Hesse study or contest that it is relevant to SIRVA.  (Ex. A.)  Although a specific finding of post-vaccination bursitis is not implicated in this case, the Hesse study still serves as some evidence suggesting that it can take up to three days to fully initiate the type of damaging local inflammatory reaction posited by petitioner's theory.

In light of the above, and considering the record as a whole, petitioner has met his preponderant burden of proof under *Althen* prong three.

### iii.  Althen *prong two*

The second *Althen* prong requires preponderant proof of a logical sequence of cause and effect, which is usually supported by facts derived from petitioner's medical records.[6]  *Althen*, 418 F.3d 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992).  While the opinions of treating physicians are often favored, *Capizzano*, 440 F.3d at 1326, a petitioner may support a cause-in-fact claim through presentation of either medical records or an expert medical opinion.  *See* § 300aa-13(a).

The Federal Circuit has cautioned that the second *Althen* prong "is not without meaning," but has also indicated that satisfaction of *Althen* prongs one and three is

---

[6] Medical records are generally viewed as trustworthy evidence.  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  These records are generally contemporaneous to the medical events and "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium."  *Id.*  However, medical records and/or statements of a treating physician's views do not *per se* bind the special master.  § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 745 n.67 (2009) (reasoning that "nothing . . . mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").

probative with respect to *Althen* prong two.[7]  *Capizzano*, 440 F.3d at 1326-27. Nonetheless, temporal association alone is not enough to satisfy petitioner's burden of proof.  *See*, *e.g.*, *Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom. Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *A.Y. v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 588, 595 (2021); *Forrest v. Sec'y of Health & Human Servs.*, No. 10-032V, 2017 WL 4053241, at *18 (Fed. Cl. Spec. Mstr. Aug. 10, 2017); *Cozart v. Sec'y of Health & Human Servs.*, No. 00-590V, 2015 WL 6746616, at *18 (Fed. Cl. Spec. Mstr. Oct. 15, 2015), *mot. for rev. denied*, 126 Fed. Cl. 488 (2016); *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V, 2012 WL 13036266, at *37 (Fed. Cl. Spec. Mstr. June 20, 2012).

Regarding the second *Althen* prong, petitioner argues that his own reporting of his symptoms as associated with his vaccination helps to support a logical sequence of cause and effect implicating the vaccine.  (ECF No. 40, p. 11.)  He further argues that this causal relationship is corroborated by his treating physicians, including two emergency department physicians who likewise associated his condition to his vaccine on two separate occasions and an immunologist who felt his condition was an adverse vaccine reaction.  (*Id.* (citing Ex. 2, p. 160, 165; Ex. 7, p. 12).)  But, in any event, petitioner urges that Dr. Srikumaran's opinion sets forth the logical sequence of cause and effect.  (*Id.* at 11-12 (quoting Ex. 21, p. 27).)

Aside from his concerns with respect to timing, which have otherwise been addressed in the preceding analyses, respondent primarily argues that petitioner cannot satisfy *Althen* prong two because his treating physicians disagreed as to whether his shoulder symptoms were caused by osteoarthritis, a prior shoulder injury, his PMR, or a degenerative disease.  (ECF No. 41, p. 18 (citing Ex. 2, pp. 165, 167; Ex. 6, pp. 8, 16, 21).)  Moreover, he contends that Dr. Abrams's opinion, which stressed petitioner's waxing and waning course, supports the conclusion that SIRVA is a less likely explanation for petitioner's shoulder symptoms.  (*Id.* at 18-19.)  Additionally, respondent argues that petitioner relies primarily on the notion of "SIRVA" without identifying a specific diagnosis that could be analyzed under *Althen*.  (*Id.* at 13-14.)

---

[7] The *Capizzano* Court described the circumstances in which *Althen* prong two may be a stumbling block as follows:

> There may well be a circumstance where it is found that a vaccine *can* cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury was actually caused by the vaccine.  A claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving the vaccine caused the injury by preponderant evidence.

440 F.3d at 1327.

I am not persuaded by respondent's arguments. As petitioner noted, Dr. Srikumaran's report explains that a logical sequence of cause and effect is demonstrated where the vaccine causes an inflammatory reaction that can lead to bursitis, tendinitis, capsulitis, and activation of previously asymptomatic chronic shoulder pathology.[8] (Ex. 21, p. 27.) In that regard, although petitioner undoubtedly had a complicated overall medical history inclusive of other musculoskeletal and/or rheumatologic complaints, his medical encounters reflect that he had an acute onset of new right shoulder pain following his vaccination (*e.g.*, Ex. 2, p. 165), whereas other complaints were not reported until later (*Id.* at 154), contemporaneous MRI evidence showing distinct pathology (including a glenohumeral joint effusion) affecting the right but not left shoulder (*compare id.* at 62-63, *with id.* at 57-58), and his treating orthopedist diagnosed, *inter alia*, a vaccine-related adhesive capsulitis (Ex. 5, p. 16). Moreover, petitioner's later medical records reflect that, even after petitioner's PMR was well established, the orthopedist still felt that petitioner had a shoulder injury additional to that PMR, which ultimately required surgery. (Ex. 11, pp. 26, 30.) And, even after he began complaining of bilateral shoulder pain, petitioner still indicated that the right shoulder was more painful. (Ex. 2, p. 154.) Although Dr. Abrams was concerned that petitioner's course changed over time, the medical records reflect that the adhesive capsulitis component of petitioner's shoulder condition was felt to have resolved with physical therapy (Ex. 11, p. 30), potentially contributing (along with ongoing steroid treatment for PMR) to the seemingly fluctuating course of petitioner's symptoms. Dr. Abrams's opinion that petitioner's glenohumeral joint effusion as demonstrated on his initial right shoulder MRI is *per se* incompatible with SIRVA (Ex. A, p. 12) is not nuanced enough to overcome all of foregoing without more. *Accord Pulsipher v. Sec'y of Health & Human Servs.*, No. 21-2133V, 2025 WL 1364203, at *12-14 (Fed. Cl. Spec. Mstr. Apr. 24, 2025) (accepting Dr. Abrams's opinion that subacromial bursitis would be unlikely to activate osteoarthritis in the glenohumeral joint, but explaining that the SIRVA medical literature does support some instances of glenohumeral involvement), *mot. for rev. denied*, No. 21-2133, slip op. (Fed. Cl. Sep. 3, 2025).

### d. Factor unrelated to vaccination

Once petitioner has met his own *prima facie* burden of proof, respondent may still demonstrate by a preponderance of evidence that the injury was nonetheless caused by a factor unrelated to the vaccination. § 300aa-13(a)(1)(B). However, although respondent argued that petitioner's complicated medical history should complicate his own *prima facie* showing, he did not argue that any other cause of petitioner's condition is preponderantly supported. (ECF No. 41.) Nor did Dr. Abrams suggest on respondent's behalf that any specific alternative cause could be supported.

---

[8] Petitioner's medical records reflect that he did have a remote prior shoulder injury (Ex. 2, p. 165), and Dr. Srikumaran's theory did also encompass the idea that the vaccine may trigger pre-existing pathology (Ex. 21, p. 27). Accordingly, seemingly out of an abundance of caution, petitioner alternatively argued that he could demonstrate a significant aggravation. (ECF No. 40, pp. 16-18.) However, respondent affirmatively argued that a significant aggravation analysis is not appropriate because "petitioner has not established a pre-existing right shoulder condition." (ECF No. 41, pp. 21-22.) Thus, it is not necessary to address significant aggravation.

Dr. Abrams opined that "a single cohesive diagnosis of a rheumatological condition is more plausible than arguing that disparate sites of musculoskeletal pain are due to a variety of unrelated medical condition which all happened to occur at the same time – which is unlikely." (Ex. A, p. 12.)  However, he did not identify what, if any, condition would explain petitioner's condition and further stressed that "[i]t should be noted that I am not an expert in rheumatology." (*Id.*)  Although Dr. Abrams did otherwise discuss petitioner's PMR diagnosis, he was careful to couch his opinion only as reflecting the unlikelihood that petitioner's condition could be explained as SIRVA and never explicitly endorsed PMR as a more likely than not explanation of petitioner's complete clinical presentation. (*Id.* at 10-11.)

## V.    Conclusion

After weighing the evidence, and considering the record as a whole, I find that petitioner has preponderantly demonstrated that he is entitled to compensation for a right shoulder injury caused-in-fact by his October 1, 2019 flu vaccination.  A separate damages order will be issued

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master